Good morning. My name is Jessica Weltman. I'm with the Federal Defenders of Montana, and I represent Joel Vargas Torres in this case, and Mr. Monty Jewell is also here to represent the codependent in this case, Mr. Pena, and we'll divide our time equally on the issues. And if I may, I'd like to reserve two minutes of time for rebuttal. Okay. Thank you. May it please the Court. Reversible trial error occurred in this case on two matters. Both of those matters can be looked at individually or taken together if the error is compounded. First, the district court committed reversible error by admitting the damaging opinion testimony of a law enforcement officer, and the record shows that that testimony is the type of testimony that's reserved for experts under the law. What part of that testimony was reserved for a law enforcement officer? The officer testified to matters concerning the money that was found in Mr. Torres' pocket, and so basically the Ninth Circuit has looked at different cases where you're looking at information. So he did testify, and his answer had two components, did it not? One was his opinion about what banks do when they pay out money to somebody who withdraws $2,100. That was the first part of why he thought his having these wads of bills in twenties was unusual. And then he also said, and, in my opinion, it's evidence of, in effect, he said, in my opinion. And then he concludes by saying, and it's evidence of narcotic trafficking. That's a different, there are two elements of opinion in there. Is that correct? Correct, Your Honor. And the element where they're directly linking the money to the drug trafficking, that's the type of testimony that the courts looked at. Do you have any objection to the first part? That is, he testified that banks wouldn't normally pay this kind of money out in the fashion that he said he had. The objection to that part of the evidence, as discussed more in our reply brief, is that shouldn't have been admitted at all. It was an opinion that would have been helpful to the jury based on his perception at the time, and it wasn't expert because it wasn't based on his training as an officer. What we're talking about mostly is the expert opinion that he gave regarding the drug connection to the money. So it's that one sentence out at the end of his statement that it was evidence of narcotics trafficking. Correct. And even though we're just talking about what seems like a minor matter with just one sentence there, it's very important given the facts of the case. I was just trying to isolate, if you wanted to, what it was. Because tying it into our modus operandi decisions, those are generally decisions which talk about how mules or people act and to educate the jury about how drug transactions go down. And so for him to say that this was evidence of narcotics trafficking does sound like it's opinion testimony related to that kind of modus operandi testimony. I haven't encountered anything in our cases where somebody is opining that somebody with a bundle of $20 bills isn't how banks expense them. I wasn't quite sure where that came from. But, okay, anyway. Yes, Your Honor. Why wasn't that statement, I saw these rolls of 20s and I thought it was evidence of drug trafficking. Why doesn't that fall within our Von Wille line of cases that say this is common enough knowledge that it qualifies as lay opinion testimony? I think that it's the testimony that's more like the modus operandi cases. When you're looking at a lot of people might carry around drugs, not drugs in their pocket, hopefully, carry around money in their pocket. And the fact that you're linking it to the drugs, that's the type of kind of innocent behavior that someone with expertise would testify to, such as a law enforcement officer and when they're looking at that. So you're looking at those line of cases that more properly fit into that area. I have another question. The way the counsel objected when the answer was about to be given, objected that it was improper opinion and that got overruled. Now, he was the officer who was describing this whole process of going through and why his suspicions were aroused. If the first part of his answer about how the banks dispense money was maybe within common knowledge, but you are arguing it's irrelevant or confusing, and then at the end the hooker comes in about the narcotics trafficking, there was no motion to strike that aspect of the testimony. Does that affect anything? Your Honor, I think the fact that the counsel objected to the matter at the beginning allows us to reserve that issue for appeal to determine whether the court abused its discretion. And I know that Counsel Mr. Roscoe here and other counsel could attest to the fact that Judge Malloy in his courtroom says, I want a one-word objection. I don't want a one-word objection. I don't, Dennis. So I believe that the opinion was reserved. Thank you. Now, why isn't this harmless in the scheme of things? This was just one aspect of describing a fairly unified group of people who were riding together in a car. There were other aspects about your client, including the fact that he lied about his name. So why, given particularly that the jury convicted Mr. Pena, why would we think the jury would have done anything more if the police officer hadn't said that? Your Honor, I don't think that the government met their burden of proof in proving the harmlessness of this issue when you look at the case in its totality. And that ties into the second issue about the need for a mere presence instruction. When you look at the evidence, although these two individuals were tried together, when you look at the evidence relating to Mr. Torres directly to the drugs, what you have that's incredibly important is the money in his pocket. The officer testified, this is evidence of drug activity. Yes, he was in the car with them, and yes, he lived for a day or two in the hotel where drugs were later found, but there is definitely a question about where the drugs were and where Mr. Torres was staying. In addition, the evidence that the jury heard, a good portion of that was coming from a co-defendant, or rather not a co-defendant, a co-conspirator in the case who had already pled guilty. And there was lengthy testimony from Mr. Bianchi regarding Mr. Torres' role in this. So in light of the extensive testimony about the Mr. Torres' participation, doesn't that make this one sentence by the detective fairly irrelevant or at least harmless? Your Honor, the judge did give the instruction that you should look at the testimony of a snitch, basically, and look at the different things that they're offered in terms of their testimony. And while Mr. Bianchi did give a long testimony, if the jury chooses to believe that, there's no – while the government has said, well, look, there are all these other – all this other testimony from other officers and other people who could confirm what Mr. Bianchi is saying should the jury choose not to believe this person, there wasn't any evidence that actually linked Mr. Torres specifically to having such a large role. There was no evidence that he – that they had been looking at him as having a large role, that there were drugs found in another place. There was no evidence in terms of Mr. Torres' substantial role that Mr. Bianchi testified to. He testified that Mr. Torres was kind of the ringleader. All the drugs belonged to him. There was no other evidence that testified about that, although there was other evidence in the trial that talked about that. I'm not sure I understand that answer there. Are you suggesting that if they disbelieved Bianchi that Torres had this greater role, they would have decided he had no role? This wasn't an issue for the jury as to whether he had a greater or lesser role. It's a question of whether he's part of the conspiracy, isn't it? Correct. But if you look – if you look at the evidence as a whole, that there is not a lot of other evidence directly linking him to this conspiracy. And Your Honor had brought up the issue of the testimony saying that not only did he have a role, he had a large role, and there wasn't a discrepancy. So they discount it and say, yes, he's just trying to push off on Torres. But is there any suggestion that they would have said Torres was just an innocent bystander entirely? If they disbelieved Bianchi. I think that the jury could have decided that he was simply present during this. Okay. As to the other issue in the case, kind of the mere presence issue, moving on to that issue, it's reversible error to not give the defense theory of the case, if the theory is legally sound and the evidence in the case makes it applicable. And here we have a case where the judge looked at the evidence after counsel requested instruction and said, sure, it looks like a good argument. Why don't you argue it? And at that point, this Court should decide that it's – He went on and said, though, it's already covered by the Pinkerton instruction. Correct. But the fact – Why wasn't it? Excuse me? Why wasn't it? The Pinkerton instruction did not actually cover this because it actually was only referring to count three, which was the gun charge that was related to this. And similarly, the conspiracy instruction, going through the elements of the conspiracy charge, went to the count having to do with conspiracy and not, in fact, to the substantive issue here. Okay. I believe my time. Yes. I'll give you a minute for rebuttal. Morning, Your Honors. Morning. My name is Monty Jewell. I was trial counsel. I represent Jose Romero Pena – Joe Pena. Mr. Pena is entitled to a new trial because the severance motion filed was not granted. At trial, Mr. Pena and Mr. Torres presented mutually exclusive defenses at their court. I don't understand that argument. It seemed that both of them were trying to discredit Mr. Bianchi. In fact, didn't you at one point say you agreed with Mr. Torres' evidence? Your Honor, I did struggle with that to some extent in your cases. But I think that the aspect of the trial that illustrates the mutually exclusive portion of the defense and also the prejudice caused by the defenses, throughout the trial, Mr. Torres sought to present his lack of English fluency as an impediment to the government's theory that he, Mr. Torres, was along as a laborer or merely present as a laborer. And one of the one or two threads of evidence against Mr. Pena was that he was somehow interpreting for Mr. Torres, despite a lot of evidence to the contrary. And yet, throughout the entire trial, Mr. Torres had an interpreter interpreting for him. And at one point, and it appears at page 106 in the transcript, the interpreter actually interrupts the trial and says, these guys aren't listening to the interpretation. You know, one of them is listening to the other, i.e., Mr. Torres is listening to Mr. Pena. The jury is being asked to decide either he needs an interpreter or he doesn't. And if it believes one fact, it has to disbelieve the other. That makes those defenses mutually exclusive. And I think there are a lot of other facts which, you know, support the prejudicial effect of the sort of cross-purposes that Mr. Torres and Mr. Pena were forced to argue, just by virtue of the trial being linked, that they were having to defend together. But I think that particular fact under Mayfield and even under Tudyk, to some extent, would establish that severance was the proper remedy and that there was no other way to exercise discretion to cure the problem. Okay. The evidence against Torres, as pointed out by Ms. Weltman, came mainly from Mr. Bianchi's testimony, but it was, there was a lot of it. He, Mr. Torres was along for every trip. He was, you know, the blue Torres, Ford Torres that they took on the trips was found near his residence. Mr. Torres knew where the meth was hidden in the car. He demonstrated the method of hiding or secreting the methamphetamine in the vehicle. He owned the scale. Mr. Bianchi tried very hard to shift the burden anywhere but on himself, but definitely on Mr. Torres. Mr. Pena, by contrast, was only along for one or two trips, depending on whether Mr. Bianchi is believed or not. And then whether or not he was interpreting for Mr. Torres. So to have Mr. Torres and Mr. Pena seated together, one of them, you know, wearing the interpreter's headphones, was so manifestly prejudicial to Mr. Pena that there was no way that, and even as able a chief judge as we have with this problem, a new trial would fix the problem, though. In particular, there was two, well, there were three room keys and two motel rooms in Bozeman at the TLC, and Mr. Bianchi, depending on whose testimony I believe, was found with room 310, and that was the room that the red duffel bag was found in with the scales and the methamphetamine and the gun. Room 314 had less incriminating material in it. You know, it could be argued that, well, these guys could go between the rooms, maybe they had access to all of the rooms, but there was a lot of testimony and a lot of cross-examination about who had access to which room. Now, the detective caller in his testimony recalled that Mr. Pena had the key to room 314 on his person, and in Deputy Peterson's affidavit, it appeared that Roy Bianchi was found with the key to room 310 on his person. Roy Bianchi later testified that he was in room 314 because it was a smoker's room, and he would not be in there with someone else with him. He wouldn't be in there by himself. So that leaves Mr. Torres and Mr. Pena to sort out which of them was in the room with Mr. Bianchi. Now, it's possible to conclude that they would go between the rooms, but the standard that the court is trying to apply is whether or not they were prejudiced, and in particular whether Mr. Pena was prejudiced. And the truth of the matter is, the more likely it was that Mr. Torres had access to room 310, the more likely it might seem to the jury that Mr. Pena also had access to room 310. And I'd like to reserve my remaining time. Okay. Good morning, Your Honors. May it please the Court? I am Tim Roscoe. I'm an assistant prosecutor and the appellate lawyer on this case. Your Honors, I'd like to begin, if I could, by addressing Mr. Torres' arguments with respect to the opinion testimony. And I guess I'll cut right to the heart of the matter on that. Even if Deputy Peterson should not have testified as he did, and even if Judge Malloy should have either granted the objection or stricken his subsequent testimony from the record, it is certainly harmless. There is a lot of emphasis on the evidence coming in from Roy Bianchi and testimony or arguments that that's basically all we've got is a little bit of evidence from Roy Bianchi. But what's important to remember about this trial is that Roy Bianchi's testimony, which was lengthy and detailed about the conspiracy, was also corroborated at various points along the way. He testified that Joel Torres supplied a blue Taurus, blue Ford Taurus, for several of the early trips. And one of the hotel registration receipts from an earlier trip to the final stop in this case had a Ford Taurus as the registered vehicle. When the marshals went to Washington to arrest Mr. Torres at his residence, there was a blue Ford Taurus parked around behind the back of the property with a temporary license plate on it or a temporary tag. That's just a couple of points. Bianchi said we took several trips during the course of the summer, and the government introduced the testimony of three individuals from hotels and several hotel records that corroborated that, in fact, at least Roy Bianchi had been out there before and corroborated the vehicles that he was driving. So I think Bianchi's testimony was so corroborated by other evidence that the government put in at trial that it really showed that he was involved in this case. I don't have any further comment on his testimony as against that of Mr. Torres about their respective roles in the conspiracy. Can I come back to your premise? Because I read Figueroa Lopez, and it's pretty clear, it seems to me, that testimony that something is similar or something that involves drug trafficking, Judge Trott was pretty clear, even highlighted the word expert, is really expert testimony. It's the kind of information that we have allowed drug experts to present to a jury because they won't, in their common, ordinary knowledge, be able to determine whether certain kinds of activities are consistent with or are evidence of engaging in drug trafficking. It seems to me that once he was giving that conclusory statement, that that's what he was up there to say, there's no question that he had to be qualified as an expert. Don't you agree with that? I don't necessarily disagree with that, Your Honor. I think that one important point that I would make in response to that concern or question is that I think Deputy Peterson could have been qualified as an expert. Well, he may have. He may have. Indeed, that's what happened in Figueroa Lopez. The panel went on and said, it's harmless error because he could have been qualified. But I don't know if this Deputy Lopez could or could not have. There wasn't any evidence taken to qualify him. Well, there certainly weren't any attempts by me to qualify him, that's correct, because I didn't anticipate him making those statements. I do think he could be qualified, and I think that, I was just looking at his initial testimony. But he does mention that he is the canine handler for Gallatin County, that he has had, that as a result, in addition to his general patrol duties, he does, at page 144 of the trial transcript, he says, I look for a lot of narcotic interdiction. He's then asked, you had training in the course of drug interdiction? He says, I have, and describes the various training classes that he's had, mostly in conjunction with his canine, in order to be able to be a certified canine handler. But it certainly leaves the impression he's had significant experience in narcotics cases and narcotics investigations. And, in fact, he also testifies, not only did I happen to be the officer on the traffic stop, but once I called the Drug Task Force agents, I stayed involved in the case, because as soon as they get the arrest warrants for the hotel rooms, I then go with them, with my canine, to the hotel rooms to have the dog do a sweep of the rooms in order to determine whether there's any specific places they should search initially, rather than later. So I think this panel could make a finding that Deputy Peterson could have been qualified as an expert to discuss that issue, even though I did not elicit more specific or detailed testimony from him on direct examination. Let me get back to the difference between Figueroa-Lopez and Von Willey. Now, in Von Willey, where the court concluded that the observations are common enough so that they can be deemed lay witness opinion, the evidence was that, for example, it was common for drug traffickers to possess and use weapons in order to protect their drugs and to intimidate buyers, and drug traffickers commonly kept a weapon near their drugs, whereas in Figueroa-Lopez, his evidence related to counter surveillance, driving, use of code words, hiding the cocaine in the door panels of the car, et cetera. The statement that Detective Peterson or Deputy Peterson made was something that when I find a large roll of $20 bills, then it's evidence of drug smuggling. How technical is that, do you think, in this context? Frankly, Your Honor, I think it probably straddles the line. You know, I think if he said nothing about that other than I took money out of his wallet. Roy Bianchi later says, for instance, one of the wads of cash is $1,300, and Roy Bianchi later says, we were selling meth for $1,300 an ounce. Certainly I would have argued in closing, you're selling it for $1,300, here's $1,300. So I think, and I guess I was thinking of this from the point of view as a prosecutor, although not that experienced of a prosecutor, and thinking, is it really something that you have to make such a leap to that you need expert knowledge, or is it something that you can just understand, yeah, you're carrying around two wads of cash, mostly 5s, 10s, and 20s. That is not consistent with taking a loan out from a bank, and it is consistent with drug trafficking. On the other hand, I don't know that you could definitively say that the average person would know or would think necessarily would make the initial leap to a chunk of cash as being associated with narcotics trafficking. One other point I'd make along that line is that what Peterson's doing during his testimony is saying, this is the first thing I saw, so this is the next thing I did. The first thing I saw is they didn't dim their license plates, or their headlights, so I pulled over to vehicle. The next thing I did is started asking him a few questions when I realized the driver was suspended. So it is really just within the context of him telling the story of the traffic stop. And I think also because he knows, and I think he knows, that under Montana law, he has to have reasonable suspicion to even run the canine around the vehicle. What he's basically doing is processing what are all the different facts that I have at this point in time that under state law would give me the authority to run my dog around the vehicle. And one of those facts in his mind is, you know, I take this wad of cash from Mr. Torres's back pocket, and it strikes me as odd that he's carrying around this much money in 10s and 20s. His response that it's a bank loan doesn't quite add up for me, because at least my experience with banks is that's not how you get your money. So I conclude it's evidence of drug trafficking. I think all he's really saying there is it's one more factor in my analysis of whether or not I have enough to run my dog around the car. And so that's another reason I think it was really harmless. He wasn't going out of his way to talk about, to tell the jury, you know, this is what this is in every case. He's really just saying, to me, this was evidence of narcotics trafficking, so I continued my investigation or ramped up my investigation. With regards to the mere presence instruction, I just don't see what Mr. Torres gets from a mere presence instruction that he does not get, not from the Pinkerton instruction, but from Pattern Instruction 8.16, the conspiracy instruction, which in essence instructs the jury of the just initial elements of the offense, and then the court goes into a rather lengthy discussion of what really is a conspiracy to try and break it out for the jury. And among the things the court tells them is you're not in the conspiracy, even if you do something in furtherance of it, but you don't know that you're helping out. You're not in the conspiracy if you don't know something about it, if you don't knowingly join it. And that was really the question for the jury. Did Torres knowingly join the conspiracy? And I don't think he gets anything from mere presence that he doesn't get from the Pattern Instruction on conspiracy. And then there's count two, the possession count, and there wasn't really something that incorporated the mere presence concept with respect to count two. That's a good point, although I don't see how the jury could possibly find that Torres was guilty of possession with intent to distribute, but not a member of the conspiracy, especially in light of the fact that when they were presented with the question on the verdict form about drug amount, they only found the conspirators responsible for the drug amount taken from the hotel room. So although Bianchi testified, we made five to seven trips, this final trip being only one of them, and brought one pound of methamphetamine each time, they were only credited with 224 grams that were taken from the hotel room. So I don't know how. And again, I guess that would come into the harmless error analysis of the lack of a mere presence instruction, specifically with regards to count two, would be harmless because there's no indication from the way that the jury considered the case that they didn't basically take one and two, consider them together and determine Torres to be both a member of the conspiracy and therefore responsible for that weight of methamphetamine brought along on that trip. With regards to Mr. Pena's arguments for severance, the discussion about the interpreter, although it is raised somewhat in the trial transcript, is really brought up by counsel for the first time today. But my reading of the trial, as we stated in our response to the court in the briefs, is that Mr. Pena and Mr. Torres, to the extent that Mr. Pena presented any defense, presented consistent defenses with one another, and that is, we are along for the ride. This is Roy Bianchi's show. It's his drugs. It's his deal. We thought we were going to come out here and get work. We have no idea what he's talking about. I don't think there's any indication that there was anything mutually antagonistic about the defenses that they attempted to present in this case. I don't think there was any error in the court's decision to deny the motion to sever in any basis for a new trial on that basis. I'm happy to take additional questions from the panel on that or other issues, and otherwise I'll rest on the briefs. Okay. I don't think there are questions. Thank you. Thank you. Nice to have you guys come down and appear in person. All of you. They like to go on video a lot, as you know. If I may address the issue about notifications. Mr. Roscoe has agreed that at least, if not an expert, they should be able to consider the issue here, straddle the line of expert, and so it should be considered. The first issue of the qualifications, Mr. Peterson, in the record, we know that he was a canine handler. We don't know how long he had been a canine handler. We don't know how many cases he dealt with. And that's in stark contrast to the Figueroa case, where the agent there, although not qualified as an expert, per se, the court decided he could be because he was a special agent in the Drug Enforcement Task Force. He had over 200 drug enforcement cases. He had seven to eight cases at a time in drug issues and had special training on that issue. And that's in stark contrast to what we know about Peterson. So this Court does not have that information to say, well, we can say that he was an expert, so the information should be admissible. The Court never went through the process of looking at the profit of value of that information. But we know that because he wasn't proffered as an expert. Correct. So we never had all of those special things that went along with 702. And I would add the fact that Mr. Peterson had talked about the fact that he would sweep the rooms in terms of the drug enforcement cases. That actually adds to the problem, because it's basically buttressing to the jury the idea that I'm a person who knows a lot about this, so you should be listening to me, and there weren't those special protections of Rule 702. And as far as that goes, the error itself cannot be seen as harmless when you look at the full portion of the facts there. Okay. All right. Thank you. Thank you all. Appreciate the argument. The case argued is submitted, and we'll stand in the brief recess. All right. Well, and I think I'm – I have to be brief. Under the Mayfield decision, which was cited in the briefing, it does appear that the Ninth Circuit is looking at a per se rule. I don't think we're. What's that? Is that your reading of Mayfield, a per se rule? It is. That's interesting. The facts in Mayfield, at any rate, are less prejudicial to either of the defendants than the facts in this case. Whereas in the earlier case, Tudyk, which talks about clear and manifest prejudice resulting from not severing, involved the two, Tudyk and Frank, beating a victim to death and then arguing about who had run him over the car, who had stabbed him, and whether the other assailant was intoxicated and unconscious at the time. In Mayfield, it appears to be holding that severance and retrial is proper where a defendant faces mutually exclusive defenses. And that is the situation in this case. There's the argument that Mr. Pena was serving as an interpreter is – Was that argument made to the court below? Which argument was that, that he was an interpreter? Yeah. The argument was made more generally that there was a complete lack of evidence. Did you talk about the interpreter? No, not specifically, Judge. Is that in your briefs? It is. Okay. All right. Well, we'll take a look at it. Thank you. Okay. Thank you. The case argued is submitted.
judges: Fisher, Gould, Ikuta